ORDERED.

Dated: September 28, 2018

_Karen S. Jennemann_
Karen S. Jennemann
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| KEITH A. YERIAN, | ) | Case No.  6:15-bk-01720-KSJ |
| | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | |
| | ) | |
| RICHARD BLACKSTONE WEBBER, II, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adversary No. 6:15-ap-00064-KSJ |
| | ) | |
| KEITH A. YERIAN et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION FINDING
<u>ACCOUNT IS NOT TENANCY BY THE ENTIRETIES</u>**

On remand the District Court asks me to make a factual finding whether a joint E*TRADE account ("E*TRADE Account" or "Account") owned by Keith Yerian, the Debtor, and his non-filing spouse, Sun Pak, is tenancy by the entireties property ("TBE") and exempt from the Plaintiff Chapter 7 Trustee's claims. The Court finds the E*TRADE Account is **not** TBE property, and the Trustee is entitled to a $128,000 judgment in his favor due to a fraudulent transfer.

Debtor filed a Chapter 7 bankruptcy case in 2015.[1] A few months later, the Chapter 7 Trustee objected to the Debtor's claimed exemptions[2] and initiated this adversary proceeding.[3] The trial occurred in 2016[4] and focused on three main issues: (1) whether a $256,000 transfer from the joint E*TRADE Account to Ms. Pak's solely owned account was a fraudulent transfer; (2) whether the Debtor's retirement account lost its exempt status due to prohibited transactions; and (3) whether the Debtor was entitled to a discharge under § 727 of the Bankruptcy Code.[5]

At the oral ruling, the Court denied the Debtor's discharge, found the Debtor's retirement account lost its exempt status, and held the Trustee was entitled to a $128,000 judgment against Ms. Pak for fraudulently transferring the monies from the joint E*TRADE Account to her solely owned account.[6] Ms. Pak timely appealed.[7]

The District Court vacated the final judgment and, in its remand, asked the Bankruptcy Court for additional factual findings on whether the E*TRADE Account was TBE property prohibited from creditor claims.[8] In the earlier oral ruling, I had held the Debtor and his wife owned the E*TRADE Account as Joint Tenants with Right of Survivorship ("JTWROS"). The District Court understandably now asks for clarification why the Defendants' alternative argument that the Account was TBE does not prevent turnover of the Debtor's share of

---

[1] Doc. No. 1 in Case No. 6:15-bk-01720-KSJ (the "Main Case").
[2] Doc. No. 46 in Main Case.
[3] Doc. No. 1, filed June 4, 2015; Amended Complaint is Doc. No. 55, filed February 26, 2016. Defendants are the Debtor, Sun Pak, and Mwagusi Software, LLC.
[4] Doc. Nos. 128, 130.
[5] Ms. Pak and the Debtor testified about the E*TRADE Account. The testimony focused on the theory that the E*TRADE Account was solely owned by Ms. Pak, but there was an alternative theory, mentioned in passing, that the E*TRADE Account was TBE.
[6] Doc. No. 139. The Final Judgment entered in favor of the Trustee is Doc. No. 141.
[7] Doc. No. 145.
[8] Doc. No. 170 (the "District Court Order").

the E*TRADE Account to the Chapter 7 Trustee.[9] The District Court concluded additional factual findings were necessary to evaluate whether the Account was TBE.[10]

As directed in the District Court Order,[11] I reopened the evidence, held a second trial, and closely listened to the parties' oral arguments.[12] With this framework in mind, I took the remand issue of whether the E*TRADE Account is exempt from turnover because it was TBE property under advisement, and I now will analyze the evidence and testimony from the first and second trials.

Debtor and Ms. Pak were married in Ohio on May 17, 2008.[13] Over the course of almost two years,[14] Ms. Pak's mother made wire transfers[15] to Ms. Pak and the Debtor.[16] Most of this money was used to fund the E*TRADE Account.[17] Ms. Pak testified that some of the money was

---

[9] District Court Order, p. 12. The District Court ruled this Court erred by "not linking two key findings"—that the E*TRADE Account was joint and that the Debtor and Ms. Pak were married when they opened it. *Id.*
[10] District Court Order, pp. 12-13.
[11] Doc. Nos. 172, 174.
[12] Doc. No. 176. That second trial occurred a few months ago. Doc. No. 186. Additional exhibits were submitted on behalf of the Defendants and Trustee. Doc. Nos. 184, 185.
[13] Defendant Second Trial Exh. 4. The Court will distinguish the exhibits from the two trials like this: If an exhibit was submitted in the second trial *after* remand, the Court will cite the "Trustee Second Trial Exh. ___" or "Defendant Second Trial Exh. ___." If an exhibit was submitted in the first trial *before* remand, the Court will cite the "Trustee First Trial Exh. ___" or "Defendant First Trial Exh. ___." Ms. Pak also testified she opened the account with her husband in 2008. Trustee Second Trial Exh. 1 are the trial transcripts from the two days of trial. The Court will refer to this as "November Trial Transcript" or "December Trial Transcript" with specific pinpoint citations to testimony like this "[Month] Trial Transcript, [page]:[line]."
[14] At least between December 2006 and October 2008. Trustee First Trial Exh. 12.
[15] November Trial Transcript, 107:1-3; 110:13-24 (describing how much cash was initially put in E*TRADE Account).
[16] November Trial Transcript, 133:1-25 through 136:1-25. *See also* Trustee First Trial Exh. 12 (confirmation document from Ms. Pak's mother describing how much money she wired to the Debtor and Ms. Pak).
[17] November Trial Transcript, 106:25, 107:1-25; 110:13-24 (describing how much cash was initially put in E*TRADE Account) (Question: "Is that the initial $50,000 deposit for [the E*TRADE Account]?" Answer by Ms. Pak "Yes.") (Question: "Where did that money come from?" Answer: "It [came] from Korea … that's from my, my mom. … I asked her to [send it]. … I was talking to my mother and because [the Debtor's] income wasn't that great, so I was talking about, you know, how you can start – I can start some business or something, you know. And she say, she have her land in Korea, she can borrow against to it if I needed some money to do something with that.").

a loan from her family,[18] some of the money was meant as a wedding gift,[19] and perhaps some of the money was given to provide financial help to the couple.[20]

The E*TRADE Account was opened as an investment account on October 24, 2008.[21] Ownership was established as a JTWROS between the Debtor and Ms. Pak.[22] No signature card for the account exists because it is an online investment account, but the Trustee and the Defendants both submitted the account opening documents that describe the account and confirms ownership was JTWROS.[23] During the second trial, the Court admitted a declaration of a records custodian from E*TRADE who stated:[24]

> [E*TRADE] diligently and thoroughly searched its database for the account information requested. The above listed account [for Keith A. Yerian and Sun Y. Pak, Joint Tenants with Rights of Survivorship] was opened on October 24, 2008[,] and was titled as a Joint with Rights of Survivorship account. From the account opening date, October 24, 2008[,] through present day, E*TRADE did not offer the option of a Tenancy by the Entirety account.[25]

After the initial funding and Debtor's frequent trades, the E*TRADE Account substantially increased in value.[26] Ms. Pak testified she made all the decisions about the trades, but the Debtor manually made the trades.[27] Debtor's son testified that the Debtor was an experienced stock trader.[28] Ms. Pak testified the E*TRADE Account was her first experience trading stocks.[29] The

---

[18] November Trial Transcript, 106:13-25, 107:1-25, 110:13-25, 111:1-19, 113:11-25, 114:1-5, 131:14-25 through 133:1-6, 135:1-25 through 138:1-4 (describing how and why money was given to Ms. Pak and the Debtor and the series of transactions that grew the accouunt).
[19] November Trial Transcript, 133:7-10 ("[M]y parents gave me that, that $2,000, for the wedding gift").
[20] November Trial Transcript, 106:13-25, 107:1-25, 110:13-25, 111:1-19, 113:11-25, 114:1-5, 131:14-25 through 133:1-6, 135:1-25 through 138:1-4 (describing how and why money was given to Ms. Pak and the Debtor and the series of transactions that grew the account).
[21] Trustee Second Trial Exh. 5; Defendant Second Trial Exhs. 1-4.
[22] *Id.*
[23] Trustee Second Trial Exhs. 5 and 6; Defendant Second Trial Exhs. 2 and 3.
[24] Trustee Second Trial Exh. 4. The records custodian is Thomas Walsh.
[25] *Id.*
[26] November Trial Transcript, 106:13-25, 107:1-25, 110:13-25, 111:1-19, 113:11-25, 114:1-5. *See also* Defendant First Trial Exh. 16 (showing stock transactions).
[27] November Trial Transcript, 103:1-25; 104:1-25; 105:1-25. *See also* November Trial Transcript, 177:16-25 (Debtor testified he was only on the E*TRADE Account to view Ms. Pak's transactions).
[28] November Trial Transcript, 67:12-25; 68:1-25; 69:1-25; 70:1-18.
[29] November Trial Transcript, 103:11-16.

value of the E*TRADE Account increased substantially in a little under four years.[30] Ms. Pak testified repeatedly and specifically the money in the E*TRADE Account was not the Debtor's money.[31] Debtor also testified repeatedly the money in the E*TRADE Account was not his money.[32] Yet, from the day the Account was opened, ownership was JTWROS.

In March 2012, when the Debtor's former wife, Debbie Yerian, was pursuing claims against the Debtor, a $256,000 transfer was made from the E*TRADE Account to Ms. Pak's solely owned account (the "Transfer").[33] This is the alleged fraudulent transfer. Ms. Pak used the money transferred from the E*TRADE Account to purchase a house in Florida, to fix up the house after it was purchased, and for living expenses.[34] The Transfer occurred while litigation was pending between the Debtor, Ms. Pak, and the Debtor's ex-wife.[35]

---

[30] November Trial Transcript, 109:16-25, 110:1-25, 111:1-13. *See also* Trustee First Trial Exh. 5 (showing account balance in March 2012).

[31] November Trial Transcript, 117:7-15 ("[I]t's not his money anyway. So it was my money from my mother for – I think it was my money cause it was **never been his money**. Then also, I needed the money to buy the house or move away to somewhere else.") (emphasis provided); 118:1-6 ("Well, we were just supposed to have been separated, the worse that – you know, I don't think it be really idea to buy the house in joint account. **And it wasn't his money.** I didn't know—other than I just that time, I don't think that he should be in the—his name in the joint account.") (emphasis provided); 133:11 through 136:1-25 (describing the transfers from Ms. Pak's mother); 139:10 through 140:9 ("[The E*TRADE Account] was **my account and my funds**") (Question: "Okay. That was your intent, right, that that account be your account with your funds?" Answer: "Yes.") (emphasis provided). *See also* December Trial Transcript, 19:1-6 (Question: "Did your husband have permission from you or did your husband recognize that this money was your money and not his?" Answer: "Yes." Question: "Did he have the right to take any of this money?" Answer: "No."); *See also* Trustee's First Trial Exh. 20, p. 4 ("The [E*TRADE Account] was my account and my funds. [Debtor] only had rights to view my account.").

[32] November Trial Transcript, 170:4-17 ("It was not my money… It was not my money… I did not do anything in that account with her without her permission."); 173:20-23 ("It's not my choice. It's her choices that she made."); 177:16-25 (Question: "The [E*TRADE Account] belongs to Sun Pak. But I also had my name on the account so that I could view her transactions. Why did you need to view her transactions?" Answer: "I don't—I'm sorry. Her English is not really good and she needs help with reading things and so she asked me to help her with that." Question: "And so that's the only reason you're on the [E*TRADE Account]?" Answer: "Yes."); 213:20 through 214:1 (Question: "Was this your wife's money?" Answer: "It was my wife's money. I would not—I was not allowed to use it.").

[33] November Trial Transcript, 115:20-25, 116:1-18. *See also* Trustee First Trial Exh. 5, p. 7 (showing $256,000 transfer).

[34] November Trial Transcript, 116:12-18; 119:1-25; 120:1-14.

[35] November Trial Transcript, 89:1-11; 100:10-25, 101:1-25; 117:16-25; *See also* Defendant First Trial Exhs. 11, 12.

Trustee asserted[36] and proved at trial the Transfer was actually fraudulent under Sections 726.105(1)(a) of the Florida Statutes ("FUFTA").[37] However, "[u]nder both the fraudulent transfer provisions of the Bankruptcy Code and the Florida Uniform Fraudulent Transfer Act ("FUFTA"), a transfer of property exempt from creditors may not be the subject of an action to avoid a fraudulent transfer. … FUFTA excludes property held as a tenancy by the entireties from treatment as a recoverable asset if the TBE property is subject to process by a creditor holding a claim against only one spouse."[38] "[W]hen property is held as a tenancy by the entireties, only the creditors of both the husband and wife, jointly, may attach the tenancy by the entireties property; the property is not divisible on behalf of one spouse alone, and therefore it cannot be reached to satisfy the obligation of only one spouse."[39] This makes sense because a creditor should not be able to unwind a transfer if the creditor could not have reached the exempt property *before* the alleged fraudulent transfer.

---

[36] The Trustee asserted the Transfer was both constructively and actually fraudulent under Sections 726.105(1)(a) and (b) of the Florida Statutes.

[37] Doc. No. 55, ¶¶ 70-82. Section 726.108 of FUFTA "provides that a creditor [or a trustee standing in the shoes of at least one unsecured creditor under 11 USC 544(b)] may avoid a transfer that is fraudulent under Section 726.105" of the Florida Statutes. *Cameron v. Lifsey (In re Carpets, Inc.)*, 522 B.R. 718, 720 (Bankr. M.D. Fla. 2014). A transfer is fraudulent if the debtor made a transfer with "(a) the actual intent to hinder, delay, or defraud any creditor of the debtor," or (b) the debtor did not receive "reasonably equivalent value in exchange for the transfer." Fla. Stat. §§ 726.105(1)(a), 726.105(1)(b); *In re Pearlman*, 460 B.R. 306, 317 (Bankr. M.D. Fla. 2011). To determine a "transferor's actual intent in fraudulent transfer cases, courts … look at the totality of the circumstances and the badges of fraud surrounding the transfers." *Id.* at 317. Badges of fraud include: "Whether the transfer was to an insider; Whether the debtor retained possession or control of the property after the transfer; Whether the transfer was concealed; Whether before the transfer was made the debtor had been sued or threatened with suit; Whether the transfer was substantially all of the debtor's assets; Whether the debtor absconded; Whether the debtor removed or concealed assets; Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; Whether the debtor was insolvent or became insolvent shortly after the transfer was made; Whether he transfer occurred shortly before or after substantial debt was incurred." Fla. Stat. § 726.105(2). "The Court may additionally consider any other factor it deems relevant and should look to the totality of the circumstances in determining actual fraud." *Wells Fargo Bank, N.A. v. Barber*, 85 F. Supp. 3d 1308, 1317 (M.D. Fla. 2015).

[38] *Jensen v. Anderson (In re Anderson)*, 561 B.R. 230, 240 (Bankr. M.D. Fla. 2016).

[39] *Beal Bank, SSB v. Almand & Assocs.*, 780 So.2d 45, 53 (Fla. 2001); *See also Balding v. Fleisher*, 279 So.2d 883, 884 (Fla. 3d Dist. Ct. App. 1973) (TBE property cannot be made available for judgment debts of one spouse); *Sheeler v. U.S. Bank of Seminole*, 283 So.2d 566 (Fla. 4th Dist. Ct. App. 1973) (TBE account not subject to garnishment or execution to pay debt of one spouse).

The issue here is whether the Debtor and his wife have a valid argument that the Account really *was* owned TBE and not as JTWROS. TBE, as defined by *Florida* law, is a unique form of property ownership only married couples may enjoy.[40] In Florida, both real and personal property can be owned TBE.[41] Six unities must exist simultaneously for property to be owned as TBE in Florida: (1) unity of possession (joint ownership and control); (2) unity of interest (the interests must be identical); (3) unity of title (the interest must have originated in the same instrument); (4) unity of time (the interests must have commenced simultaneously); (5) survivorship; and (6) unity of marriage (the parties must be married when the property became titled in their joint names).[42]

The District Court Order recognized the insulation of TBE property from certain creditor claims but opined the same protection is not extended to other joint tenancies, like JTWROS.[43] Marriage is the "single variance" that distinguishes TBE and JTWROS.[44] The Florida Supreme Court announced a presumption in favor of TBE for married couples that jointly own property (the "*Beal Bank* Presumption").[45] The *Beal Bank* Presumption that marital personal property is TBE arises when all six unities are present.[46] Joint accounts between a husband and wife usually meet the six unities.[47] Courts must then determine whether there was an express disclaimer by the couple *not* to own the property TBE.[48]

---

[40] *Beal Bank*, 780 So.2d at 52.
[41] *Id.* at 53-54.
[42] *Id.* at 52. "Should one of these unities never have existed or be destroyed, there is no entireties estate." *United States v. One Single Family Residence With Out Buildings Located at 15621 S.W. 209th Ave., Miami Fla.*, 894 F.2d 1511, 1514 (11th Cir. 1990).
[43] District Court Order, p. 5.
[44] District Court Order, p. 6.
[45] *Beal Bank*, 780 So.2d at 53-55.
[46] *In re Daniels*, 309 B.R. 54, 59 (Bankr. M.D. Fla. 2004).
[47] *Cohen v. Mathews (In re Mathews)*, 307 F. App'x 266, 268-69 (11th Cir 2009).
[48] *Beal Bank*, 780 So.2d at 60. The Florida legislature codified the *Beal Bank* Presumption, and the statute is consistent with *Beal Bank*. Fla. Stat. § 655.79); *In re Benzaquen*, 555 B.R. 63 (Bankr. S.D. Fla. 2016) (Judge Isicoff noted that the statute "codified the presumption judicially established in *Beal Bank*" and was "consistent" with *Beal Bank*'s holdings); *In re Aranda*, No. 08-26059-BKC-PGH, 2011 WL 87237, at *3 (Bankr. S.D. Fla. Jan. 10, 2011) ("*Beal Bank* also states that if the necessary unities are present, and the Debtor establishes that the bank expressly precluded TBE … then a debtor may prove by extrinsic evidence that he intended to create a tenancy by the entirety even if the signature card contains an express disclaimer of TBE ownership … In this circumstance, no presumption arises and the debtor has the burden of establishing a tenancy by the entireties by a preponderance of the evidence.").

Typically, a party contending marital property is held in another form of ownership carries the burden of proof by a preponderance of evidence to establish TBE was **not** created.[49] If the *Beal Bank* Presumption applies, the Trustee would then carry the burden to show that the property is not TBE.[50] The Trustee could show, for example, that the couple fraudulently created the TBE property.[51] However, under the legal interpretation and instructions in the District Court Order, when an institution does not offer TBE as a form of ownership or expressly precludes TBE ownership, the *Beal Bank* Presumption would *not* apply and the burden would shift to the Debtor to prove he intended to own the property TBE by a preponderance of the evidence.[52] The District Court Order directed this Court "to examine the circumstances surrounding the opening of the E*TRADE Account, specifically whether: (1) E*TRADE allowed TBE ownership; and, if so, (2) the couple expressly disclaimed it."[53] Following the explicit directive of the District Court Order,[54] the Court finds that the *Beal Bank* Presumption does not arise here: E*TRADE did not offer TBE as a form of property ownership for the Account. Because no presumption arises that the Account is TBE, the burden shifts to the Defendants to prove by a preponderance of the evidence that the E*TRADE Account was TBE property. The Court finds the Defendants have not carried their burden.

---

[49] *Beal Bank*, 780 So.2d at 58.
[50] *Id.* at 58-59.
[51] *Id.* at 61; *Govaert v. B.R.E. Holding Co. (In re Blitstein)*, 105 B.R. 133, 135 (Bankr. S.D. Fla. 1989).
[52] *Beal Bank*, 780 So. 2d at 61 ("However, if the debtor establishes that the financial institution did not offer a tenancy by the entireties form of account ownership or expressly precluded that form of ownership, then the debtor may prove by other evidence an intent that the debtor and his or her spouse held the account as a tenancy by the entireties. In this circumstance, no presumption arises and the debtor has the burden of establishing a tenancy by the entireties by a preponderance of the evidence."); *See also* District Court Order, p. 8 ("Indeed, Florida law does not ascribe a type of ownership to an account that the financial institution expressly chooses not to offer. Nevertheless, if the debtor still maintains that the couple intended the property as TBE, he can offer such evidence. As such, the debtor shoulders the burden to show TBE ownership, still by preponderance of the evidence.").
[53] District Court Order, p. 12.
[54] This Court is bound to follow the District Court Order in both "letter and spirit." *See Waczewski v. Weatherford*, 241 Fed. App'x 647, 651-52 (11th Cir. 2007) (discussing the law of the case doctrine and the mandate rule).

Ms. Pak and the Debtor testified over and over that the money in the Account belonged solely to Ms. Pak. There is not a scintilla of testimony that the Debtor and Ms. Pak intended to own the E*TRADE Account TBE. There are a few seconds of argument in the Debtor's closing statement that mentions the E*TRADE Account is "either … [TBE] with all the unities, or under section 541(d), it's not property of the estate because the Debtor holds, as of the commencement of the case, only legal title and no equitable interest. … And so, it's either a [TBE] account under [Beal] Bank or it's not property of the bankruptcy estate under Section 541(d)."[55] A single question by Debtor's counsel to the Debtor mentions TBE: "When that account was set up, did you have any option to your knowledge to elect that account as [TBE]?" Debtor answered: "No."[56] Nothing in the record establishes any intent by the Debtor or Ms. Pak to own the Account TBE.

There is another wrinkle in the intent analysis because the Debtor and Ms. Pak opened the E*TRADE Account in 2008, when they lived in Ohio. At the second trial, the Trustee highlighted this fact. Ohio does not now recognize TBE as a form of property ownership and did not then recognize TBE in 2008 when the E*TRADE Account was opened.[57] In Florida, exemptions are determined under Florida state law with some exceptions.[58] However, because the Debtor and Ms. Pak opened the E*TRADE Account in Ohio, a state that does not recognize TBE as a form of

---

[55] December Trial Transcript, 51:8-23, 52:1-7.
[56] November Trial Transcript, 211:1-6.
[57] Trustee Second Trial Exh. 7. *See also Cent. Benefits Mut. Ins. Co. v. RIS Admrs. Agency, Inc.*, 1994-Ohio-393, 70 Ohio St. 3d 68, 70, 637 N.E.2d 291, 292 (Ohio 1994); *In re Cline*, 164 B.R. 592, 594 (Bankr. S.D. Ohio 1994) ("After 1985, a tenancy by the entireties as it was known from 1972 to 1985 could no longer be created in Ohio.") The statute regarding tenancy by the entireties in Ohio dealt with real property; the Court could find little case law on whether Ohio recognizes tenancy by the entireties as a form of ownership in personal property. *But see* Reif v. Reif, 86 Ohio App. 3d 804, 808, 621 N.E.2d 1279, 1282 (1993) ("Ohio courts have not, to our knowledge, considered the issue of how proceeds from the sale of entireties property are treated. [The code] is silent on the treatment of proceeds from the sale of entireties property. However, given that Ohio has abolished tenancy by the entireties, we choose to adopt the approach that a tenancy by the entireties does not continue in the proceeds of a sale of entireties property. … Generally, a tenancy by the entireties may exist only in realty. However, there is some authority to the effect that a tenancy by the entireties may exist in personalty, if such personalty is the proceeds of realty held by the entireties.").
[58] *In re Kelsey*, 477 B.R. 870, 872 (Bankr. M.D. Fla. 2012) (discussing the statutory framework of § 522(b) and Florida and Colorado exemptions).

property ownership, the Court questions whether it was even possible for them to intend to establish the account TBE when it was opened.[59]

The E*TRADE Account is JTWROS. The account was established as JTWROS. Debtor controlled the E*TRADE Account. The Court found the Debtor and Ms. Pak's testimony incredible that Ms. Pak made all of the decisions about the E*TRADE Account. Debtor is an experienced stock trader. Ms. Pak had no experience trading stocks. The parties owned the E*TRADE Account together. Yet they are not entitled to any presumption that the Account was owned as TBE. E*TRADE did not allow TBE ownership. And Ohio does not and did not recognize TBE ownership when the Account was opened. The Defendants cannot carry their burden to show the Account is TBE after testifying repeatedly the money only belonged to Ms. Pak and Ms. Pak made every decision about the Account. Because the E*TRADE Account is not insulated TBE property, the Trustee may reach the account.

The Court again finds that the Transfer is fraudulent under Fla. Stat. § 726.105(1)(a). These badges of fraud are present: Ms. Pak is an insider of the Debtor as his wife and the Transfer was made to an account solely owned by her; the Debtor controlled, operated, and managed the E*TRADE Account prior to the Transfer and grew its value substantially; the monies from the E*TRADE Account were used to purchase a home in Florida that the Debtor and Ms. Pak lived in together; and the Transfer was made to divest any ownership interest the Debtor may have in the monies or disguise the monies to frustrate the litigation between the Debtor, the Debtor's ex-wife,

---

[59] *Goldman v. Dzikowski*, Case No. 05-80668-civ-Altonaga/Turnoff, 2006 U.S. Dist. Lexis 97009 at *13-14 (S.D. Fla. Mar. 8, 2006) ("[T]he state of the applicable law surrounding Appellant's acquisition of the property at issue rebuts the presumption and makes its application inappropriate. Because Arizona law precluded Appellant and his spouse from purchasing the personal property with the requisite intent to hold it as [TBE], the bankruptcy court did not err as a matter of law in not affording Appellant the *Beal Bank* presumption."); *Dzikowski v. Kirshner (In re Kirshner)*, Case No. 05-34406-BKC-PGH, 2007 WL 3232258 (Bankr. S.D. Fla. Oct. 30, 2007) ("Given the requirement of intent and the unity of time, the issue of whether a tenancy by the entireties was created must be determined pursuant to New Jersey law, the state where the property was acquired. … New Jersey does not recognize the existence of [TBE] in personal property.") *But see In re Koesling*, 210 B.R. 487 (Bankr. N.D. Fla. 1997) ("[O]wnership interest in the promissory note is a moveable and should be governed by the laws of the owner's current residency.").

and Ms. Pak. These badges of fraud and the totality of the circumstances surrounding the Transfer lead the Court to conclude the Transfer was actually fraudulent. The Trustee is entitled to a $128,000 judgment in his favor under Fla. Stat. § 726.105(1)(a). A separate judgment shall enter simultaneously with this Memorandum Opinion.

###

Richard Webber is directed to serve a copy of this order on interested parties who do not receive service by CM/ECF and file a proof of service within three days of entry of the order.